UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40018-FDS

| | |
|---|---|
| AIDA GONZALEZ, ANTONIO GONZALEZ, MILBIA VAZQUEZ, ANTHONY GONZALEZ, ALEXIS GONZALEZ, ALEXANDER GONZALEZ, and ADRIAN GONZALEZ,<br><br>Plaintiffs<br><br>v.<br><br>CITY OF FITCHBURG, CHARLES TASCA, Chief of Police, LINDA SWEARS, MICHAEL SEVIGNY, JEFFREY HOWE, KERRY SIOMOS, JR., MATTHEW DIBARA, ALAN ROSS, THOMAS DAOUST, MASSAMONT INS. AGENCY, INC. and/or METROGARD INS. and/or DIPLOMAX INS. and/or LEGION INS. COMPANY,<br><br>Defendants | DEFENDANTS CITY OF FITCHBURG AND CHARLES TASCA'S L.R. 56.1 STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED |

## I.      Plaintiffs' Allegations Against the Individual Defendants[1]

1.      The plaintiffs are all members of the Gonzalez family, residing in the City of

Fitchburg (the "City"). Milbia Vazquez and Antonio Gonzalez are common-law

husband and wife. Aida Gonzalez is Antonio's mother. Anthony Gonzalez,

Alexis Gonzalez, Adrian Gonzalez, and Alexander Gonzalez are sons of Milbia

and Antonio.

2.      At the time of the incident underlying the Complaint, defendant Charles Tasca

("Tasca") was Chief of the City's Police Department (the "Department"). Linda

Swears ("Swears") was a Sergeant in the Department. Michael Sevigny

---

[1]The facts set forth in Paragraphs 1 through 8 are taken from the Complaint, and the deposition testimony of plaintiffs Milbia Vazquez, Alexis Gonzalez, Adrian Gonzalez, and Alexander Gonzalez. They are conceded by the City and Tasca for purposes of the Motion for Summary Judgment only. Aida Gonzalez, Antonio Gonzalez, and Anthony Gonzalez did not respond to deposition requests and are the subject of a Motion to Dismiss that is pending before the Court.

("Sevigny"), Jeffrey Howe ("Howe"), Kerry Siomos ("Siomos"), Matthew Dibara

("Dibara"), Alan Ross ("Ross") and Thomas Daoust ("Daoust") were officers in

the Department.

3.      On the evening of November 19, 2001, all plaintiffs except Anthony Gonzalez

were at the family home on 20 Simonds Street.  Staying with the family but not

home at that time was a cousin, Steven Gonzalez.  Complaint, ¶19.

4.      On that date, Sevigny secured an arrest warrant for Steven Gonzalez, and a search

warrant for the premises at 20 Simonds Street, in connection with a complaint for

assault and battery with a dangerous weapon (a gun) against Steven Gonzalez.

Complaint, ¶18.  Sevigny, Swears, Howe, Siomos, Dibara, Ross, and Daoust

executed the warrant at the 20 Simonds Street premises.  Id.

5.      The plaintiffs claim that, when the officers arrived at their home, they used

excessive force against them, acted in a racially discriminatory manner toward

them, and effected unlawful arrests of Adrian Gonzalez, Alexis Gonzalez, and

Anthony Gonzalez.  Complaint, ¶¶30-51, 60-61

6.      Specifically, plaintiffs allege that the officers haphazardly identified various

members of the family as Steven Gonzalez, and without provocation tackled and

handcuffed Alexander Gonzalez; handcuffed, kicked, and tackled Antonio

Gonzalez; tackled, struck, maced and wrongfully arrested Adrian Gonzalez;

pointed a gun at, punched, and wrongfully arrested Alexis Gonzalez; and grabbed

Milbia Gonzalez as she attempted to assist her sons.  Complaint, ¶¶30-51.

7.      Plaintiffs further allege that when Anthony Gonzalez arrived at the house during

the incident, having been summoned by his mother, the officers called him

"Steven," struck him, threw him against a fence, maced him, and wrongfully arrested him. Complaint, ¶¶60-61.

8.    Adrian Gonzalez and Alexis Gonzalez further claim that, as they were transported to the police station, the officers driving the cruiser prohibited them from speaking Spanish, and twice accelerated the cruiser and slammed on the brakes, causing the brothers' heads to hit the divider between the front and back seats. Complaint, ¶¶64-68.

9.    The plaintiffs also claim that, at the police station, the officers played a game wherein they repeatedly directed Anthony Gonzalez, who was blinded by mace, to follow sounds toward the water, causing him to stumble into furniture, before allowing him to wash his eyes out. Complaint, ¶63.

10.   Anthony, Adrian and Alexis Gonzalez were charged with disorderly conduct and resisting arrest, for which they received court summonses.[2] All charges were dismissed. Complaint, ¶78. Steven Gonzalez eventually turned himself in and was charged with assault and battery with a dangerous weapon, of which he was acquitted at trial. Complaint, ¶77.

## II.    Plaintiffs' Claims Against the City and Tasca

11.   Plaintiffs do not allege that Tasca was personally involved in the events of November 19, 2001, or otherwise directly violated plaintiffs' constitutional rights.

12.   Plaintiffs claim that the City and Tasca are liable for the officers' alleged use of force and racial discrimination, because they engaged in a custom and policy of failing to investigate citizen complaints of excessive force by police officers, particularly complaints of Hispanic citizens, and of failing to discipline officers

---

[2]None of the Gonzalezes was jailed.

for use of excessive force.  Complaint, ¶¶108-109, 111, 115-116.  These failures,

the plaintiffs assert, demonstrate deliberate indifference to the use of excessive

force against citizens, particularly Hispanic citizens.[3]  Id.

13.    The plaintiffs further allege that Tasca failed to promulgate and enforce

regulations regarding excessive force, Complaint, ¶110, and also make passing

reference to an alleged failure by the City and Tasca to properly train their

officers.  Complaint, Introduction.

## III.    Undisputed Facts Material to Plaintiffs' Claims Against the City and Tasca

### A.    The Department's Procedures for Investigating Citizen Complaints

14.    The Department has a detailed policy regarding the receipt and investigation of

citizen complaints of officer misconduct (the "Policy"), which was in effect on

November 19, 2001.  Affidavit of Mark W. Louney ("Exhibit A"), ¶3.  Pursuant

to the Policy, all alleged violations of the Department's Policies and Procedures

must be investigated, and investigations into citizen complaints are to be

conducted "with the same degree of professional competence as is devoted to a

criminal investigation."  Exhibit A, ¶4.  No person may be denied an opportunity

to file a complaint.  Id.  Any attempt to obstruct an investigation into a citizen

complaint, or to persuade a complainant to withdraw a complaint, is prohibited,

"and will be treated most severely."  Id.  Each complainant must be notified, in

writing, of the results of the investigation into his/her complaint.  Id.

15.    Citizen complaints will be accepted by telephone, letter, or in person.  Complaints

may be made anonymously.  Exhibit A, ¶5.

---

[3]Plaintiffs do not assert any custom or policy of permitting wrongful arrests.

16.   Each citizen complaint is initially processed by the Shift Commander, who is

      directed to extend "the utmost courtesy and cooperation" to the complainant.

      Exhibit A, ¶6.

17.   Each complaint is recorded on a standard form, a copy of which is provided to the

      complainant. Exhibit A, ¶7. Complainants are encouraged to sign their

      complaint, but neither a signature nor identification of the complainant is

      required. Id. A complaint will be investigated even if the complainant provides

      incomplete information. Id.

18.   The Policy sets forth specific procedures for investigating citizen complaints.

      Exhibit A, ¶8. Complaints of a minor nature are to be resolved immediately by

      the Shift Commander, if possible. Id. Serious complaints, including complaints

      of brutality, excessive force, and civil rights violations, are investigated by the

      Department's Internal Affairs Unit ("IAU"). Id.

19.   An IAU investigation into a citizen complaint must be commenced "forthwith,"

      and must be completed within 90 days. Exhibit A, ¶9.

20.   Each IAU investigation may include a review of any police report generated

      during the incident at issue, interviews of the complainant, the officer that is the

      subject of the complaint, and any witnesses to the incident, including other

      officers. Exhibit A, ¶10. An officer who does not respond completely and

      truthfully to an IAU inquiry is subject to discipline, including dismissal from the

      Department. Id.

21.     The Department may require an officer to submit to a medical or psychological

exam, be photographed, or take part in a lineup during an IAU investigation.

Exhibit A, ¶11.

22.     A written report on each investigation is submitted to the Chief of Police.  Exhibit

A, ¶12.  A report is submitted even if the complaint is withdrawn by the

complainant.  Id.  The report includes all evidence gathered during the

investigation, an evaluation of the complaint, and a disposition of the complaint.

Id.

23.     A complaint may result in a finding of "Sustained," meaning the officer violated

Departmental policy or law; "Not Sustained," meaning the complaint cannot be

resolved due to insufficient or conflicting evidence; "Unfounded," meaning the

complaint was deemed false; or "Exonerated," meaning the act complained of

occurred, but was legal, proper and necessary.  Exhibit A, ¶13.

24.     The report to the Chief also includes a recommendation as to whether discipline is

warranted and, if so, what type.  The Chief reviews each report, and imposes

discipline where warranted.  Exhibit A, ¶14.  Disciplinary measures may be in the

form of "positive discipline," such as an order to attend further training, or

"negative discipline," which may include a verbal reprimand, "statement of

counseling," a written reprimand, punishment duty, anger management

counseling, or a suspension of up to five days.  Id., ¶15.  A suspension of longer

than five days, or termination, may be imposed by the Mayor, who is the City's

appointing authority.  Id.

25.    The Department keeps statistics on the number of citizen complaints filed each

year, and the disposition of each.  These statistics are published in the

Department's Annual Report, which is available to the public.  Exhibit A, ¶16.

From 1996 through 2000, the Department received and investigated between 15

and 31 citizen complaints each year.  Id. , ¶17.  Each year, between two and eight

complaints were Sustained.  Id.

26.    None of the plaintiffs in the above-captioned action filed a complaint with the

Department, either verbally or in writing, regarding the events underlying this

case.  Exhibit A, ¶18.

27.    On April 12, 2005, plaintiffs Milbia Vazquez and Alexis Gonzalez, along with

Alexis' wife Jessica, came to the Department to complain about Jessica Gonzalez'

step-parents.  A police Captain met with the complainants and offered them

guidance regarding their concerns, resolving the complaint to their satisfaction.

Exhibit A, ¶19.

**B.    The Disciplinary Histories of the Individual Defendants**

28.    In the 10 years prior to the incident underlying this case, no citizen complaints

were filed against Sgt. Linda Swears.  Exhibit A, ¶21.

29.    In the 10 years prior to the incident underlying this case, no citizen complaint

alleging discrimination of any kind was filed against any of the defendant

officers.  Exhibit A, ¶22.

30.    In the 10 years prior to the incident underlying this case, a total of eight civilian

complaints of abuse or mistreatment, of either a physical or verbal nature, were

filed against the seven defendant officers combined.  Exhibit A, ¶23.  Each of

these complaints was investigated pursuant to the procedures set forth above.  Id.

31.    One investigation resulted in Exoneration of the subject officer.  Exhibit A, ¶24.

Five of the complaints were deemed Not Sustained.  Id.

32.    Two complaints were Sustained.  Each of these complaints was directed at a

different officer, and discipline was imposed in each case.  Exhibit A, ¶25.  In one

instance, the subject officer received five days of punishment duty for using

abusive language toward a third party during an arrest.  Id.  In the other instance,

the subject officer received a statement of counseling for mishandling an incident

whereby an individual interfered in the arrest of another.  Id.

**C.    The Department's Anti-Discrimination Policy**

33.    Pursuant to the Department's Policy on Professional Demeanor and Conduct, the

withholding of any police service, or the application of any enforcement

procedure, due to an individual's status, including race, is prohibited.  Exhibit A,

¶26.  This policy further provides that such discrimination constitutes formal

misconduct that is subject to sanction.  Id.

**D.    The Department's Use-of-Force Policy**

34.    The Department has a detailed policy on use-of-force (the "Force Policy").

Pursuant to the Force Policy, an officer is taught to use "only the force reasonably

necessary" for self-defense and to effect a lawful arrest.  Exhibit A, ¶27.

35.    The Force Policy incorporates the "Force Continuum," a guide to the proper

amount of force to be used in bringing an incident under control.  The Continuum

emphasizes that the minimum amount of force necessary should be used.  Exhibit

A, ¶28.  The Continuum instructs officers on the different types of force available – including verbal commands, physical maneuvers, use of batons, chemical spray, and lethal force – and the circumstances under which it is appropriate to use each type of force.  Id.

36.    The Force Policy also provides that any officer who uses force shall file a written report regarding the use of force, which shall be reviewed by the Shift Commander, as well as higher-ranking officers.  Exhibit A, ¶29.

**E.    The Department's Hiring and Training Procedures**

37.    All candidates for positions as officers in the Department undergo a thorough screening process that includes: investigation into the candidate's criminal history and driving history; solicitation of references; a physical examination and physical ability test; medical examination; drug test; and a psychological assessment performed by a psychologist and/or psychiatrist.  Exhibit A, ¶30.

38.    Following screening, all officers hired by the Department attend an in-state Police Academy.  The Academy curriculum includes courses on use-of-force.  Exhibit A, ¶31.

39.    After graduating from the academy, each officer receives from one to three weeks of in-house training provided by the Department.  Included in the training is a page-by-page review of the Department's Policies and Procedures, including all of the policies referenced in this Affidavit.  This review is conducted by a supervising officer.  Exhibit A, ¶32.

40.   Following in-house training, each new officer undergoes "field training," in which he/she is assigned to work with a veteran officer.  The duration of field training varies with the needs of the individual officer.  Exhibit A, ¶33.

41.   All officers are required to attend 40 hours of In-Service Training each year. The first 32 hours of In-Service Training are provided by the Municipal Police Training Committee (formerly the Massachusetts Criminal Justice Training Council). The training curriculum includes courses on use-of-force (in accordance with state standards). The last eight hours of In-Service Training are provided by the Department, and includes a review of the Force Policy and training/re-certification in the use of department issued weapons.  Exhibit A, ¶34.

42.   To keep officers updated on the law, the Department issues training bulletins, which explain recent changes in the law.  The Chief of Police also issues General Orders which incorporate legal changes into the Department's Policies and Procedures.  Exhibit A, ¶35.

43.   In addition to In-Service Training, officers are frequently authorized to attend specialized training courses that are provided by the Department's training staff, the Municipal Police Training Committee, the Massachusetts State Police, and various State, Federal, and Independent Organizations.  From 1996 through 2000, the Department's officers (approximately 90 in number) received between 4,952 and 11,187 hours of training each year, exclusive of that received at the academies.  Exhibit A, ¶36.

**IV.    Plaintiffs' Presentment Letter**

44.    On August 1, 2002, plaintiffs sent the City a purported presentment letter, pursuant to G.L. c.258, §4, the Massachusetts Tort Claims Act, with respect to the events of November 20, 2001 (the "Letter").  Exhibit B.  The Letter contains no reference whatsoever to any alleged negligence by the City or the defendant officers in this case.  Id.  Instead, the letter alleges constitutional and intentional torts, such as a "brutal and unprovoked beating … motivated by [plaintiffs'] race."  Id., ¶1.    The Letter also asserts that the City failed to adequately train and supervise its officers, in violation of the Fourth and Fourteenth Amendments.  Id.

> DEFENDANTS
>
> CITY OF FITCHBURG AND
> CHARLES TASCA,
>
> By their attorneys,
>
> /s/Joseph L. Tehan, Jr.
> Joseph L. Tehan, Jr. (BBO # 494020)
> Jackie Cowin (BBO# 655880)
> Kopelman and Paige, P.C.
> 31 St. James Avenue
> Boston, MA  02116
> 617-556-0007

272695/METG/0539

I, Jackie Cowin, certify that the above document will be served by first-class mail upon any party or counsel of record who is not a registered participant of the Court's ECF system, on or before February 1, 2006. /s/Jackie Cowin.