UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 04-40018-FDS

_____

AIDA GONZALEZ, et al.

     Plaintiffs

v.

CITY OF FITCHBURG, et al.

     Defendants

_____

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT CITY OF FITCHBURG AND CHARLES TASCA'S  MOTION FOR SUMMARY JUDGEMENT

I.     INTRODUCTION:

Plaintiffs oppose Defendants Motion for Summary Judgement stating:

a) Even accepting the defendant's legal citations without objection, they fail to make a case that the issues raised in the plaintiff's complaint can be determined as a matter of law.

b) This Court has yet to rule on plaintiffs Motion to Extend time to Complete Discovery. Plaintiffs would benefit from such discovery in preparing its opposition to defendant's Motion for Summary Judgement.

c) Defendants LR 56.1 Statement of Material Facts was filed late and should be not allowed. Without waiving such objection to late submission the Plaintiffs admit paragraphs 1 – 13 and deny that paragraphs 14 – 44 are undisputed.

    The Plaintiffs in this action seek damages for violations of the rights and protections afforded them under the Forth and Fourteenth Amendments to the

Constitution of the United States of America, and analogous provisions of the Massachusetts Bill of Rights, by officers of the Fitchburg Police Department, its Chief of Police and the City of Fitchburg.

## II.     SUMMARY JUDGEMENT STANDARD

In order for the moving party to prevail in a motion for summary judgement they must show that the non moving party has no reasonable expectation of prevailing on the merits of its claim, Fireman's Fund Ins. Co. v. Harley Realty Co., 24 F.Supp .2d, 117, 118 (D.Mass 1998). All inferences are to be drawn in the non-movant's favor and the evidence of the non-movant is to be believed. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III.     ARGUMENT:

In their memorandum in support of their Motion for Summary Judgement the defendants basically set forth a single argument. That because the City has in place policies and procedures for officer conduct and the investigation of citizen complaints against its police force, they are free from any liability to the plaintiffs. Of course the fact that the City *has* policies does not mean that such policies are *enforced*. In defense of their theory the City puts forth statistics. However, when exposed to the light of day, these statistics are troubling at best and in and of themselves raise questions that beg for examination by fact finders. We will review these statistic below. Also the City seems to claim that their policies are rigorously adhered to. But as we will see adherence to their policies and procedures is haphazard at best.

First defendants state that "plaintiffs offer no evidence supporting their claim that the City and Tasca ignore complaints of excessive force" Memorandum, Page 5 pp2 and

that "the Fitchburg Police Department...diligently investigates such complaints..."
Memorandum, Page 6 pp1 and that "[e]ach complainant must be notified, in writing, of
the results of the investigation into his/her complaint Id., Page 6 pp4. One needs only
look at the case before the Court here to see that this claim is plainly false.

The Gonzalez family did not go to the police department to file a complaint about
the events occurring at their home 20 Simonds Street on November 19, 2001 because
they were afraid to file their complaint with the same people that brutalized them.
However they filed a specific and detailed complaint through counsel. On August 1,
2002 a presentment letter, in accordance with MGL c.258 s.4, was sent to Mayor Dan H.
Mylott by certified mail. See Exhibit A attached hereto. The Massachusetts Supreme
Court has held that the purpose of a presentment letter is to, among other things,
investigate the alleged incident, increase the likelihood of out of court settlements,
prevent future similar incidents and to promote effective government. McGrath v.
Stanley, 397 Mass 775 (1986). This statement is specifically set forth in paragraph 2 of
said letter. The letter goes on to give a detailed account of the events occurring at 20
Simonds Street, Fitchburg on November 19, 2001 and requested that a copy of the results
of the City's investigation be forwarded to this office. No response was made by the City
to such letter. On October 16, 2002 a follow up letter was sent to the Mayor complaining
about the City's failure to respond and again requesting the results of the City's
investigation. See Exhibit A1 attached hereto. No response was received to this letter.
Finally, on November 22, 2002 a third letter was sent requesting the results of the City's
investigation, also without response. See Exhibit A2 attached hereto. However on or
about November 13, 2002 this office received a letter from Massamont Insurance

3

Agency, Inc. from an Elizabeth T. Brown, Litigation Specialist, indicating that she had completed *her* investigation. See Exhibit A3 attached hereto. One can only conclude that the City conducted no investigation into this matter. If the City did in fact conduct an investigation, it certainly did not share the results of such investigation with the Plaintiffs, not withstanding the requirements of its policies. The question of whether the City follows its own polices and procedures should be a question for the finder of fact.

The City further states that pursuant to the Departments formal policy "citizens are afforded every opportunity to file a complaint against a police officer". Memorandum, Page 6, pp2. This blanket statement seems to issue a challenge to the finders of fact. How widely is the City's policy disseminated? How is the policy made known to citizens? How does the City encourage aggrieved citizens to come forward when it would be the natural impulse of anyone experiencing abusive behavior on the part of the police to stay as far away from the police station as possible?

The City states that "in order to keep apprised of the extent of complaints against its officers, the Department keeps statistics on the number of citizen complaints filed each year, and the disposition of each." Memorandum, Page 8, pp1. They state that the statistics show that "from 1996 through 2000, the Department received and investigated between 15 and 31 citizen complaints each year" and that "between 2 and 8 complaints were substantiated" each year. We believe that these statistics could be read to show something far more ominous.

They provide a page from their Annual Report (Reproduced here as Exhibit B.) It shows that in 1996 the Department had 16 citizen complaints and that 3 were sustained and that in 1997 they had 15 citizen complaints and 2 were sustained. In 1998 there were

4

31 complaints and 4 were sustained. In 1999 there were 15 complaints and 6 were sustained. In 2000, 22 complaints, 8 sustained. As these statistics plainly show, the trend is towards more complaints and more complaints sustained. These numbers can be looked at another way to illustrate the point. In the first 2 years of the measured period 16 percent of the complaints made were sustained. In the last 2 years of the measured period *38 percent* of the complaints made were sustained. We believe that a Jury could find that these statistics evidence a trend. They may wish to find out if the City is concerned by the trend, and whether it has taken remedial action to combat it. They may find that the failure of the City to take remedial action when confronted by such a trend amounts to precisely the kind of "deliberate indifference to the rights of persons with whom the police come into contact" contemplated by the Courts. City of Canton v. Harris, 489 US 378, 388-89 (1989).

The City admits that "eight civilian complaints of abuse or mistreatment, of either a physical or verbal nature, were filed against the seven defendant officers" named in the case before this Court. Memorandum, Page 9, pp2. The City then suggests that for the most part these incidents were not a serious matter and in fact that the action taken in response to the complaints negates the possibility that the plaintiffs could prevail in its allegations. This suggestion is specious. Citizens sitting on a Jury may well decide that what the Department finds to be unfounded or trivial is inconsistent with their own opinion. One only needs to look at the number of complaints that were filed by citizens and rejected by the Department. (99 complaints filed, 23 sustained, See Exhibit B attached hereto).

IV.    CONCLUSION:

Because the City and Charles Tasca have not carried their burden in

demonstrating that there are no issues of fact to be determined by a Jury, and

because their own submissions to this Court raise issues of fact for a Jury, their

Motion for Summary Judgement should be denied.


THE PLAINTIFFS

AIDA GONZALEZ, et. al.

By Their attorney

Edwin L. Attella (BBO#636527)
PO Box 255
West Boylston, MA 01583
(508) 835-5881

6

EXHIBIT A

# THE LAW OFFICES OF EDWIN J. ATTELLA
## P.O. BOX 255
## WEST BOYLSTON, MA 01583

Edwin J. Attella, Attorney at Law

Telephone:                                                          Fax:
(508) 835-5881                                                   (508) 835-7880

Dan H. Mylott                                              August 1, 2002
Mayor of the City of Fitchburg                            CERTIFIED MAIL
718 Main Street
Fitchburg, MA 01420

RE: Presentment Letter in accordance with MGL c.258 s.4 for the claims of Plaintiffs
Adrian Gonzalez, Alexander Gonzalez, Alexis Gonzalez, Anthony Gonzalez, Milbia
Vasquez Antonio Gonzalez and Aida Gonzalez

Dear Mr. Mayor:

This letter is sent to you under the requirements of MGL c.258 s.4. Please be
advised that this office represents the Plaintiffs named herein who intend to seek redress
in the Federal District Court of the United States of America for the brutal and
unprovoked beating they suffered at the hands of the Fitchburg Police. On November 19,
2001 at 20 Simonds Street in Fitchburg, officers of the Fitchburg Police Department,
acting under the color of law, used extreme excessive forced when they handcuffed, beat,
kicked maced and arrested members of the Gonzalez Family. Other Family members
were detained, pushed, kicked, ridiculed and deprived medical attention. The victims of
this brutal attack were a grandparent, the parents and children of the Gonzalez family.
They ranged in age, at the time of these events, from 14 to 61 years. The actions of these
Police Officers would shock the conscience of any community. The actions of these
Police Officers, which the plaintiffs allege was motivated by their race, is a manifestation
of the failure of the City of Fitchburg to adequately train and/or supervise its employees,
is indicative of a flawed training and supervision policy and evidences a deliberate
indifference to the rights of its inhabitants. Such action violates the provisions of 42
USCA s.1983, denies the plaintiffs Equal Protection under the law and constitutes a
depravation of the rights and immunities guaranteed under the Fourth and Fourteenth
Amendments of the Constitution of the United States, and analogous provisions of the
Massachusetts Declaration of Rights.

The courts have held that the purpose of the c.258 s.4 presentment letter is to,
among other things, allow the City to promptly investigate the alleged incident, increase
the likelihood of out of court settlements, prevent future similar incidents and to promote
effective government. (See McGrath v. Stanley, 397 Mass 775 (1986).) In order to assist
the City in its investigation, the plaintiffs summarize the facts as follows.

On November 19, 2001, at approximately 8:50 PM, officers of the Fitchburg Police Department, purportedly executing a search warrant for Steven Omar Gonzalez and a gun he was alleged to possess, arrived at 20 Simonds Street in multiple marked Fitchburg Police vehicles. Steven Omar Gonzalez was a relative of the Gonzalez family visiting from Puerto Rico. According to police reports filed in this incident the officers on the scene included Officers Michael Sevigny, Jeffrey Howe, Kerry Siomos, Jr., Matthew Dibara, Alan Ross, Thomas Daoust, an Officer McDermott and Sgt Linda Swears, the "Street Supervisor" (see report of Sgt. Swears dated 11/19/01). Officers approaching the house first spoke with 16 year old Alexander Gonzalez. Alexander was in the upstairs window. He had come to the window upon seeing all the police vehicles on the street. He was asked by an officer, believed to be Officer Sevigny if Steven was home. Alexander told him no. The Officer then stated that he should tell Steven to come down because they had some papers for him from school. "Stevens not here", he told him. Alexander then called down to his mother, Milbia Vasquez, that the police were at the door. Milbia, who had coincidentally been on her way out to drive home a visiting guest, 17 year old Jessica Valente, went to the door. Alexander came down to see what was going on. When she opened the door, she was met by Officers Sevigny, Ross, Siomos, Dibarra and Sgt. Swears. Officer Sevigny informed her that they had a search warrant for Steven Gonzalez. She told them to come in and asked: "What did he do?" In response she was told that "he shot a Hispanic boy, like him". This was not true. No allegation of a shooting has ever been made.

At this point Officer Sevigny noticed Alexander standing inside the threshold with his mother. He yelled "Steven" and grabbed him by the neck, threw him to the floor, slamming his face into the floor and put him in handcuffs. The mother screamed: "that's not Steven, that's my son, Alexander!" She was ignored. Officer Sevigny then pulled the boy to his feet by the handcuffs, shoved his mother out of the way and pushed him into the house and threw him on the floor, ordering him to remain there. As this was occurring other officers and Sgt. Swears rushed past into the home. As these events unfolded, Alexis Gonzalez, 17, was in the bathroom urinating. An officer opened the door and entered. Alexis called out for whomever it was to wait; thinking it was one of his family members. He was told "Put your hands up." The officer called him "Steven" and "Omi". As he was urinating he looked back over his shoulder and saw an officer, who may have been Officer Siomos, pointing a gun at him. Alexis complied, raising his hands. "Hands against the wall!" the officer yelled. Alexis attempted to reach down to put himself inside his pants. The officer put the gun to his head and screamed "I said hands against the wall!" Alexis complied. He was handcuffed and shoved out into the hallway and thrown on the floor. Officer Sevigny was there and yelled at him to stay there.

While events were transpiring in the bathroom, Officer Sevigny had rushed into the living room and pulled Antonio Gonzalez, 42, Milbia's husband and the boys father, off of the couch where he had been lying watching television, slammed him to the floor, handcuffed and kicked him, telling him to stay put. Antonio Gonzalez mother, Aida

Gonzalez, 61, was also in this room and witnessed what happened to her son. Sivigny also brought Alexander into the room and threw him on the floor with his father. At about this time, 14 year old Adrian Gonzalez, who had been up in his room doing homework appeared on the stairs. He called out, what's going on. Immediately, Officers Sevigny and Ross rushed him, calling him "Steven". He was maced, and had his legs pulled out from underneath him, smashing face first down onto the stairs. He was dragged down the stairs and handcuffed, Officer Ross kneeling on his back. He was screaming "Mommy, Mommy, I can't see, I can't breath!"

Milbia Vasquez was screaming. "That's my son Adrian, not Steven, he has asthma, you'll kill him. Officer Sevigny grabbed her by the shirt and told her: "Shut up! Do you want me to arrest you?" In response she yelled: "Yes, arrest me and leave my children alone!" At this point Sgt. Swears told Officer Sevigny to take his hands off of her. This appears to have been the extent of her supervision on the scene.

Adrian was dragged into the hall where Alexis had been thrown to the floor. Alexis had been trying to tell the officers that he had identification that would prove that he was not "Steven" but he was ignored. Another officer had told Alexis to get up and when Sevigny came around the corner he yelled: "I told you to stay down!" and punched Alexis, knocking him to the floor. He then grabbed him by the neck and slammed his head into the door jam. Alexis and Adrian were then taken outside and locked in the back of the police car. Adrian was calling for water and his mother was pleading with the police officers to give him some. They were denied and told that the effects of the mace would wear off in 30 minutes.

During the time that these events were occurring, Aida Gonzalez began to gasp, shake, and turn blue. She suffers from congenital heart problems and was in fact here from Puerto Rico to have treatment. Milbia Vasquez, contrary to what was reported in the police reports, repeatedly requested that the police call for medical attention. Her requests were ignored. In fact, Officer Sevigny asked another officer to put Mrs. Gonzalez in handcuffs. (He also inquired why Jessica Valente wasn't in handcuffs.) Milbia Vasquez eventually used the upstairs phone to call her son, Anthony, who lived with his family, several blocks away. She told him that the police were there, that his grandmother was very ill and that the police were refusing to call for an ambulance. She asked him if he could come and drive his grandmother to the hospital. Anthony had left his automobile and his parents house in case his grandmother had a problem, they would have a vehicle to take her to the hospital with. Anthony agreed to come and started to run from his home down to his parents house. During this time, apparently finally deciding that Mrs. Gonzalez really was in serious distress, the police called for an ambulance. Jessica Velente and Milbia Vasquez were outside as Mrs. Gonzalez was being taken to the ambulance This is when Anthony Gonzalez arrived. He was sweating and out of breath from his run. Officers of the Fitchburg Police, calling him "Steven", ran out to him. He was thrown against a wire fence, cutting his hands, even as he attempted to cooperate with their search of him. The officers struck him; maced him handcuffed and arrested

him, even though he possessed multiple pieces of identification. His mother was screaming at them that this was her son Anthony. She was ignored.

Antonio and Alexander were released from handcuffs and Alexander was ordered to take the police upstairs and show them where everyone slept. Alexis and Adrian were transported in one car; Anthony in another. During transport 14 year old Adrian was still crying, telling his brother that he couldn't breath and asking if he was going to die. He was speaking Spanish, his first language. Alexis tried to comfort him, telling him that he would be all right. The officer transporting them, believed to be Officer Howe, yelled to them, that there would be no speaking Spanish in his car. Alexis said: "I don't have the right to speak to my brother in my own language?" The Officer answered: "You want your rights?" He accelerated for a stretch, then slammed on the brakes, launching the two handcuffed brothers into the glass partition between the back and front seats, tossing them around in the interior. "There's your rights," he told them.

At the Police Station, Anthony Gonzalez was made sport of, tormented by police officers. He was still blinded by the mace. Officers tapped on the water eye wash station and taunted him to try and find his way to wash out his eyes. One police officer asked 14 year old Adrian if Anthony was the "leader of the gang". Adrian replied: "No, that's my big brother." Both Adrian and Anthony were asked if they were members of the "Latin Kings". They denied any affiliation with any gang of any kind. When Anthony was finally allowed to present his identification, the police wanted to know why he had so many. They told him he had too many I.D.'s.

On November 20, 2001, at approximately 5:30 PM a police officer, believed to be Officer Ross, returned to 20 Simonds Street. Milbia Vasquez met him on the porch outside the home. The officer said: "I'm sorry for what happened last night. What happened last night should never have happened." Milbia Vasquez was frightened, she didn't know what might happen next. She made no response. Eventually the officer left.

Also on November 20, 2001 17 year old Alexis Gonzalez, while congregating with his friends in the City of Fitchburg was at the roadside when Officer Sevigny pulled up in a City Police vehicle. He got out of the car and approached the boys. He addressed himself to Alexis. "Did you tell your friends what I did to you last night?" He inquired. "Make sure they know that the same thing can happen to them."

Later on November 20th, State Police officers arrived at 20 Simonds Street. They spoke with Milbia Vasquez and told her they wanted to talk to her children about their affiliation with the "Latin Kings". She was terrified.

On November 25, 2001, on his way home from work, dropping his Father off at 20 Simonds Street, Anthony Gonzalez was intercepted by Fitchburg Police officers who demanded to see his license and registration. Although everything was in order, he was handcuffed, arrested, charged with operation without a valid license and transported to

Page 5

the police station. His car was towed and searched. Nothing was found. The next day the charges were dismissed at arraignment. Anthony Gonzalez had a valid driver's license from Puerto Rico.

The charges against Anthony, Alexis and Adrian for resisting arrest were dismissed without a plea or a finding.

It should be noted that some of the plaintiffs speak no English, and the others speak it as a second language. `

These acts of brutality, coercion and intimidation are shocking and a gross abuse of power, beyond the pale of reasonableness in civilized society. These officers intentionally abused the Gonzalez family, used racial slurs and vulgar language and did so under the color of their authority. The City's improper training of its "Street Supervisor", Sgt. Swears, rendered her unable to control the officers under her charge and materially contributed to creating the out of control situation that led to the Plaintiffs harm. It is the intention of these plaintiffs to seek redress against the police officers involved individually, in their official capacity and against the City of Fitchburg for all the reasons enumerated above. The Plaintiffs demand for settlement is $700,000 ($100,000 per Plaintiff).

Thank you in anticipation of your attention to this matter. Please assign this matter to a member of you legal staff at you earliest convenience so that your investigation of these allegations can proceed. I look forward to communicating with you or your representative in the near future.

Very Truly Yours,

Edwin J. Attella

EXHIBIT A-1

# THE LAW OFFICES OF EDWIN J. ATTELLA
## P.O. BOX 255
## WEST BOYLSTON, MA 01583

Edwin J. Attella, Attorney at Law

Telephone:
(508) 835-5881

Fax:
(508) 835-7880

October 16, 2002

Dan H. Mylott
Mayor of the City of Fitchburg
718 Main Street
Fitchburg, MA 01420

RE: Follow up to MGL c.258s.4 Presentment Letter on behalf of Plaintiffs Adrian
Gonzalez, Alexander Gonzalez, Alexis Gonzalez, Anthony Gonzalez, Milbia Vasquez,
Antonio Gonzalez and Aida Gonzalez.

Dear Mr. Mayor:

As you are aware, this office represents the above named Plaintiffs, who are
seeking redress from an attack by members of the Fitchburg Police Department on
November 19, 2001 in their home at 20 Simonds Street. On August 1, 2002 I sent you a
certified presentment letter under the provisions of MGL c.258s.4, receipt of which was
acknowledged by your office. The courts have held that the purpose of such presentment
letter is to allow the City to promptly investigate the alleged incident, prevent future
similar incidents, to promote effective government and to increase the likelihood of our
of court settlements. Since the time of such letter and acknowledgement I have received
no contact from your office. In fact, the only contact I have received at all is from
Massamont Insurance Agency who, in a letter dated August 19, 2002 stated that the
City's is insurer, Legion Insurance Company, is under the control of the Insurance
Commissioner of the Commonwealth of Pennsylvania by order of the court and that as a
result there is a suspension of all claims negotiations (see attached). While this I'm sure
this presents administrative problems to the City, it does not inform my Clients as to the
nature and findings of any investigation.

Please accept this letter as a request for information as to the results of you
investigation into this matter. As you can imagine, my Clients are anxious to hear what
steps are being taken by the City address the injustice that has been perpetrated upon
them and to prevent future incidents from occurring.

If you have any questions in this regard please do not hesitate to contact me.

Very Truly Yours,

Edwin J. Attella

# EXHIBIT A-2

# THE LAW OFFICES OF EDWIN J. ATTELLA
## P.O. BOX 255
## WEST BOYLSTON, MA 01583

Edwin J. Attella, Attorney at Law

Telephone:
(508) 835-5881

Fax:
(508) 835-7880

November 22, 2002

Dan H. Mylott
Mayor of the City of Fitchburg
718 Main Street
Fitchburg, MA 01420

RE: Further follow up to MGL c.258 s.4 Presentment Letter on behalf of Plaintiffs
Adrian Gonzalez, Alexander Gonzalez, Alexis Gonzalez, Anthony Gonzalez, Milbia
Vasquez, Antonio Gonzalez and Aida Gonzalez.

Dear Mr. Mayor:

As you are aware, this office represents the above named Plaintiffs, who are
seeking redress from an attack by members of the Fitchburg Police Department on
November 19, 2001 in their home at 20 Simonds Street. On August 1, 2002, and again on
October 16, 2002 I sent you certified notices in conformance with MGL c.258 s.4, receipt
of which was acknowledged by your office. Since such time I have received only
correspondence from your Insurance Company, which continues to be in "rehabilitation
status".

While it is understandable that you would ask your Insurance Company to
*participate* in your investigation, c.258 s.4 clearly states that the purpose of the
presentment letter is to allow the *City* to promptly investigate the alleged incident to,
among other things, prevent similar incidents and to promote effective government.
Therefore I am once again requesting from you information relating to *the City's*
*investigation.* I am never surprised when an insurance company denies a claim. I suggest
that the legislative history of MGL c.258 s.4 would show that the drafters were looking
for more from the City.

If you have any questions, or require additional information, please do not hesitate
to contact me.

Very Truly Yours,

Edwin J. Attella

EXHIBIT A-3



The Insurance Package for
Government Subdivisions



1 (413) 774-2067
1 (800) 444-3916
1 (413) 774-3916 (fax)

November 13, 2002

Edwin J. Attella
Attorney at Law
P.O. Box 255
West Boylston, Massachusetts 01583

RE: MAS-24385
Claimants: Adrian Gonzalez, et al.
Insured: City of Fitchburg
Date of Loss: 11/19/01

Dear Mr. Attella:

I have completed my investigation of your clients' claim. It is my position the City of Fitchburg
was not negligent and committed no wrongful acts when executing the search warrant at 20 Simonds Street,
Fitchburg, Massachusetts on November 19, 2001.

As you are aware, the Fitchburg officers served a warrant at your clients' home and attempted a peaceful
entry. Officers were not dressed in swat gear and the front door was never rammed. As you know, the
officers were looking for a handgun and Stephen Gonzalez. They were let in the home after the warrant
was explained and, at that time, many of the occupants inside the Gonzalez home began scattering, running
away and up stairs, yelling in Spanish to each other (making comprehension difficult if not impossible for
the officers), and attacked officers as they attempted to secure the home.

The situation escalated to an extremely chaotic state due to the actions of many of the occupants of the
home. No excessive force was used by any of the officers involved while the search warrant was executed.
Any force that was used to control attacking, fleeing, or resisting occupants of the home and persons who
came upon the premises was necessary and used judiciously to assure the safety of everyone who was on
the scene. The Gonzalez family was told many times to calm down, stop resisting, and to cooperate, but
the orders were not complied with. The officers did need to gain control over the situation in order to
search for the gun that the officers rightfully felt could have been located anywhere in the home.

Based on my investigation, it appears that all the officers involved with the warrant acted properly to assure
the safety of the Gonzalez family and themselves. Many of the occupants of the Gonzalez home turned
what could have been a peaceful execution of a search warrant into a chaotic and dangerous situation. As
such, I must respectfully deny your clients' claims.

You should know that as of today the rehabilitation status of Legion Insurance Company remains the same.



*The Insurance Package for*
*Government Subdivisions*



1 (413) 774-2067
1 (800) 444-3916
1 (413) 774-3916 (fax)

Please do not hesitate to contact me should you have any questions.  Your anticipated cooperation is appreciated.

Sincerely,

Elizabeth T. Brown
Litigation Specialist

CC:  Kimball-Cooke, Inc.
P.O. Box 1028
Athol, Massachusetts 01331

# EXHIBIT B

# CITY OF FITCHBURG
# POLICE DEPARTMENT

20 Elm Street
Fitchburg, Massachusetts 01420-3204

# 2000 ANNUAL REPORT



**CHIEF EDWARD J. GALLANT JR.**
**30 YEARS OF SERVICE**
**October 21, 1970 – January 26, 2001**

# IN GRATEFUL APPRECIATION AT HIS
# RETIREMENT

## COMPLAINTS AGAINST OFFICERS

|  | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| SUSTAINED | 3 | 2 | 4 | 6 | 8 |
| MISCONDUCT NOT BASED ON COMPLAINT | 0 | 3 | 1 | 0 | 0 |
| EXONERATED | 2 | 1 | 3 | 1 | 0 |
| UNFOUNDED | 2 | 0 | 1 | 1 | 3 |
| NOT SUSTAINED | 9 | 6 | 20 | 5 | 11 |
| PENDING | 0 | 3 | 2 | 2 | 0 |
| TOTAL | 16 | 15 | 31 | 15 | 22 |

## CLASSIFICATIONS OF COMPLAINTS AGAINST OFFICERS

### SUSTAINED
Allegation and violation did occur and was a breach of standards, policy or law.

### EXONERATED
When the evidence indicates that the act complained of did in fact occur but was legal, proper, and necessary.

### UNFOUNDED
When the act complained of did not in fact occur and that the complaint was false.

### NOT SUSTAINED
When the case cannot be resolved by investigation, either because sufficient evidence is not available, or because of material conflicts in the evidence, or uncooperative witnesses.

### MISCONDUCT NOT BASED ON THE COMPLAINT
When the investigation reveals that the employee was guilty of misconduct not part of the original complaint.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served upon the attorney of record for the defendants by forwarding same by pre-paid first class mail this date to:

Joseph L. Tehan, Esq.
KOPELMAN & PAIGE
31 St. James Avenue
Boston, MA 02116-4102

_____  2-10-06
Edwin J. Attella        Date